HENRY L. WYMAN *vs.* EUGENE OLIVER.

Sagadahoc.     Opinion November 27, 1883.

*Fishing privilege. Dower. Reversion.*

The commissioners to set off a widow's dower assigned to her with other parcels, "the fishing privilege from Hiram Morse's wharf to the north line of the land owned by the deceased in his own right." The remainder of the estate, excluding the reversion of the widow's dower, was subsequently distributed among the heirs. *Held,*

1. That by the assignment of dower, the whole of the fishing privilege, between the points named, whether any part of it was, or ever had been, in use as a privilege or otherwise, was severed from the upland.

2. That the distribution among the heirs, prevented the release of dower from restoring the fishing privilege to its former condition of an incident to the upland, and rendered it necessary in the distribution of the reversion, to treat it as distinct property.

ON REPORT, on motion to set aside the verdict.

Trespass upon a certain fishing privilege in Phipsburg. The writ was dated December 17, 1881. The plea was the general

issue, and a brief statement, claiming that the acts done, were authorized by a third person, who was owner of the land. The verdict was for the plaintiff with nominal damages, and this verdict the defendant moved to set aside.

The opinion states the material facts.

*W. Gilbert*, for the plaintiff.

*C. W. Larrabee*, for the defendant, in an able argument contended as indicated in the opinion, citing: *Edwards* v. *Currier*, 43 Maine, 474; *Eaton* v. *Jacobs*, 49 Maine, 559; *Goddard* v. *Cutts*, 11 Maine, 440; *Wells* v. *Waterhouse*, 22 Maine, 131.

DANFORTH, J. This case has been tried before a jury resulting in a verdict for the plaintiff, and comes up upon a motion to set that verdict aside. The only question is as to the title of the premises. The charge in the writ is in substance an invasion of the plaintiff's fishery, by erecting a weir upon it. The place described is upon the western shore of the Kennebec river, in the town of Phipsburg, where the tide ebbs and flows, and below high water mark. The plaintiff is the owner of a fishery, some farther up the river, and claims to own the fishing privilege along the shore, down to, and including the place where the defendant, as he concedes, erected the fixtures complained of. No question is raised as to any public right of fishing, but only whether the defendant has by his weir invaded the private and exclusive rights of the plaintiff. The defendant concedes that he built the weir as charged, but claims that he did so as the lessee of William H. Higgins, the alleged owner, and thus the question of title is presented. If Higgins is the owner, or if the plaintiff has no title, the verdict must be set aside. If the plaintiff has a title it must stand.

Both parties claim under Mark L. Hill, who formerly owned the upland on the western bank of the Kennebec river, extending three hundred to four hundred rods up and down the river, and opposite to the fishery in question. It is conceded that as riparian owner, under the ordinance of 1641, his title extended to low water mark, subject to the rights of the public, not now

in question, and of course included the premises in dispute. In 1842 or 1843 Mr. Hill died intestate, and left this property to his heirs. He also left a widow, whose dower was set out to her by order of the probate court in 1844. In assigning her dower, the commissioners with other parcels of the estate, assigned to her, "the fishing privilege from Hiram Morse's wharf to the north line of the land owned by the deceased in his own right." This description included all the fishing privilege in front of the land of the deceased, and for the widow's natural life, and so far as an assignment could do so, severed the fishing privilege from the upland, for it is to be noticed, that no part of the land set out, bordered upon the river, except two small lots, and they were in express terms limited to high water mark.

We cannot concur with the counsel that this description referred only to such privileges as were then or had been in use. It does not use the plural number, but refers to one privilege and one only, and that a continued one from the southerly to the northerly line of the farm. If it were not in use, it would nevertheless be a privilege, a right to take fish and use the means necessary for that purpose, and would pass in a conveyance under that name, equally as if in use. This privilege though not then in use, now occupied by the defendant, was included within the limits specified, and must be considered as having passed to the widow by the assignment.

In 1844, but subsequent to the assignment of the dower, the remaining portion of the Hill estate, except the reversion of the dower, was distributed among the heirs. This, too, was done by a warrant from the judge of probate. In this distribution, in the assignment of the lots bordering upon the river, with one exception, not material to this case, "the fishing privilege was reserved to the dower." Thus keeping up the severance between the flats and the upland, and while the latter was divided the former was left undivided. Under this division it does not appear that the heirs, or any of them claimed any part of the fishing privilege, or that the commissioners intended to, or did assign it, but the contrary is evident.

In 1847 the widow having conveyed or released her dower to the heirs, another division was made, and this too, by order of the judge of probate. As the fishing privilege had been severed from the upland, in this distribution, it became proper and necessary even, to treat it as a distinct piece of property, and not as incidental to the upland, and it was so treated in the assignment. The release of the dower by the widow did, undoubtedly, as claimed by counsel, relieve the estate of that incumbrance, but it did not restore the fishing privilege to its former position, as incidental to the upland. If so, the effect would have been to destroy the equality of that division. The only way to prevent this, was that of treating it as distinct property, which was done by the commissioners. In pursuance of this plan the commissioners, as a part of the share of Helen H. Morse, assigned to her "all the fishing privilege east of the dower, and belonging to the same." It is true all the fishing privilege did not lie directly east of the dower, but it was in that direction, and there was, as we have seen, no fishing privilege whatever, "belonging" to the dower as incidental to it, but only by virtue of the assignment, and that was all that belonged to the estate. Thus Mrs. Morse obtained a title to all the fishing privilege, including that in question. This is the fair construction of the language of the commissioners, and must have been their meaning for no other assignment of any portion of the privilege was made.

Mrs. Morse appears to have retained the title, thus obtained, until her death, after which in a distribution of her property among her heirs, the commissioners assigned to Jacob G. Morse, as a part of his share, "all the fishing privileges and flats belonging to said dower lot." This is substantially the same language used in the assignment to Mrs. Morse, and the connection shows that the dower lot is the same as that there referred to.

By deed dated September 8, 1865, Jacob G. Morse conveyed to Christopher Cushing "the fishing privilege east of the dower, set off to me in the division of the estate of my late mother."

November 6, 1868, Andrew C. Hewey, as administrator on the estate of said Cushing, conveyed to John Tucker the "lot or

parcel of land and flats opposite of Lee's Island, used as a fishing privilege, known as the Morse privilege, with all the rights and privileges connected therewith, which the said Christopher Cushing bought of Jacob G. Morse, by his deed, dated September 8, 1865."

October 5, 1871, Tucker conveyed to the plaintiff the fishing privilege, "known as the Morse privilege, with all the rights connected therewith, which the said Christopher Cushing bought of Jacob G. Morse, by his deed dated September 8, 1865."

Thus it appears that the fishing privilege in front of the farm of Mark L. Hill, by the assignment of dower, the several distributions among the heirs, and all the conveyances has been treated as one privilege, extending from his north to his south line, and by the description and references in these several different conveyances, the title is so clearly traced from the original owner to the plaintiff, as to leave no doubt as to the validity of his claim, or any room for that of the defendant, or his lessor.

An examination of the grounds upon which the defendant places the alleged title, under which he claims, does not change the result.

The lessor certainly has no claims by virtue of his riparian ownership. The first and continued severance of the fishing privilege from the upland, would preclude this. But his failure to sustain his title on this ground is equally, or more clear, when it is examined more specifically. This claim, if it has any foundation, must rest upon a deed from Almira H. Goss, an heir to Mark L. Hill, and to whom was assigned lot eleven upon the plan, next northerly of the dower lot. The evidence shows that the fishery claimed by the defendant, and where the erections complained of are, is situated just above the northerly line of the dower, extended to the river. It is, therefore, opposite to lot eleven, and belongs to that lot, if any. But when that lot was assigned the fishing privilege was "reserved to the dower." It did not, therefore, pass to Mrs. Goss. There is nothing in the case which tends to show that Mrs. Goss, or any of her successors, subsequently acquired any title to the fishery, and of

course could convey none. Nor does it appear that any one claimed title by virtue of riparian ownership, or pretended to convey any. Higgins himself, the defendant's lessor, testifies : "I had no claim then any farther than the edge of the marsh; I had no claim below that, till I got a deed of it." The only deed in the case, which in terms purports to convey to him or his predecessors, anything below highwater mark, is the quit claim deed of Samuel H. Morrison, dated March 13, 1880. Morrison, who had previously conveyed the upland, does not appear to have had, or claimed, any other title than that coming from Goss, which as we have seen was of the upland only. Hence, neither source of the defendant's alleged title can avail him, while that of the plaintiff is good.

> *Motion overruled.*
> *Judgment on the verdict.*

APPLETON, C. J., BARROWS, VIRGIN and SYMONDS, JJ., concurred.